Our next case is Target Corp v. United States Mr. Marshark, whenever you're ready. You can proceed. Good morning, your honor. On behalf of Nantucket Distributing Company, we ask this court to reverse the court of international trade and hold that the Department of Commerce committed a reversible error in determining the so-called mixed wax candles, which may contain merely 1% petroleum wax, are included in the scope of an anti-dumping duty order on petroleum wax candles from China. We respectfully submit that the Department of Commerce did not have the unfettered discretion to expand the scope of an anti-dumping order to include a pre-existing product of the argue order's clear and unambiguous terms. So does this rest largely on the construction of later development? This is a later development case, your honor, yes. And what is your theory exactly on what it means? Are you saying the term is clear and requires no construction? Are you saying that Congress's construction was unreasonable? We have three arguments, your honor. The first argument is that the term later development should be if the article is a pre-existing product, it's not later development. Because if the article exists in Congress, it can't be developed afterwards. And we're saying here that if we have a pre-existing article and petitioners are aware of this article and the International Trade Commission can find the order as it is. So does that mean that you're saying the definition is unambiguous because the definition is not in existence? That's how you would define it? That would be one of our arguments, your honor. That there is a definite, the term pre-existing means in existence. But we realize that petitioners in the government say you have to have commercial availability. And we're also saying that commercial availability means availability. That if an article exists and if an article is known to be in commerce, then it's available. And we're saying in this case, you have an article that was available in commerce. And that all the evidence that petitioners put on the record, they were talking about a significant commercial impact that these mixed wax candles had after the order in the late 1990s. So that buys the debt. So commerce could never go back and amend its order. Commerce... Is that what you're saying? I'm not saying never, your honor. We're saying it's... We never say never. Never say never. Under certain circumstances. Under certain circumstances they can. I believe that like the Nippon Steel case would be a case where they can. In Nippon Steel you had an order which had a precise amount of a particular chemical or a particular steel. And the product did not exist with a different amount of steel. Or boron did not exist before the order. And nobody knew that that product existed. And the respondents in that case created a product to get around the order. We have a different set of facts in our case. We have a case where our product may not have had a significant commercial impact before the order. But it definitely existed in commerce. And when you look at the definition in the International Trade Commission report, the commission said, and I'll quote, petroleum wax candles are those composed of over 50% petroleum wax. And may contain other waxes in varying amounts depending on the size and shape of the candle. So you have an express statement there that the industry knew that you had a mixed wax candle product. And they knew they had the product. And they put in the International Trade Commission report, and it was unambiguous in the report, and the Department of Commerce said it was unambiguous in their scope determinations, they said it's a 50% test. Petitioners had knowledge of this test. They had the opportunity. They had the opportunity to say, wait a second. We could have an order. We could have an order on all candles. We could have an order on candles except these wax candles. Even if that product was not in commercial streams? There's a question of what commercial streams are. We will admit that the significant commercial impact of this product did not take place until the late 1990s until after the order. Petitioners were not seriously impacted by the importation of the product until many years after the order. But that doesn't mean that this product was not commercially available and that petitioners did not have knowledge of that product. The product was available because the International Trade Commission report is talking about a mixed wax candle and they have the 50% test in the report. Candles of vegetable wax, they've existed since the report says antiquity. So on that question, what's our standard of review? Is this a substantial evidence question? We believe it's really a legal question as to how you interpret the scope of the order and what the Department of Commerce is allowed to do to extend the scope of the order when a product was existing and petitioners had knowledge of that product and there's an express statement in the International Trade Commission report saying that the order is limited to this particular product. There are a lot of questions all streaming together here. On the question of whether or not it was commercially available, are you saying that depends on how we define commercially available or does that depend on the sufficiency of evidence that was proposed? I believe in this case it depends on how you define commercially available, Your Honor. And you would define commercially available as what? Is it available? Is it somehow existing in commerce? Is it a known product? It doesn't have to have a significant impact, but is there some knowledge that this product exists? And here we have the patent evidence. We have a Union Oil Catalog. We have, and the most important part is we have the International Trade Commission talking about it. What we're saying is the standard, you don't have to have a tremendous amount of evidence. It just has to exist and you have to have knowledge. If a product exists and there's knowledge and petitioners know that that product exists and they know it exists commercially. Well, so what does exist commercially mean? That it's already on sale? That it's ready for sale? Well, that it's somehow in commerce, which is defined, you know, very broadly. I mean, commerce, somebody, there's a patent on it and the International Trade Commission talks about, in the report, it talks about the fact that you could have candles that are made of mixed waxes. So you know, at that time, this wasn't something that's alien to petitioners. They knew that there was a product in the market, someplace out there, that it's a mixed wax candle and they had a choice. And the same way that the petitioners in the Wheatley case had a choice, they knew, they could have said, let's have it water on all candles. They didn't do that. They said, let's have it water on petroleum wax candles. And the International Trade Commission came in and said, okay, petroleum wax candles, we're giving you a precise definition. That's the definition. These products, they exist. They're out there in commerce and they don't have to be, you don't have to have a million advertisements. You don't have to have a million marketing studies. And people really didn't buy candles based on how much wax. But the products are there. There are patents there. And the patents that were existing... Because it says petroleum wax, that doesn't necessarily govern it. Does that mean that it's 51% petroleum wax or 20% petroleum wax? It says petroleum wax candles. If you have over 50% petroleum wax, you're within the order. If you have less than 50% petroleum wax, you're outside the order. And you did have candles that existed. And it was knowledge that these candles were there. It wasn't a case of somebody creating a new product that nobody even could have dreamed about before. This is a product that was there. Was it a major product? No. Were there a lot of imports from China at the time? No. We admit all that. But it was there, they knew it. And they should have done something then. Because that is the order. The language of the order is very important. People base their business decisions based on this is what the order says. Could the Commerce Department at that point then decide to start a new investigation? No, they could have. They absolutely could have. Petitioners at any time could have brought a new case on these candles. And petitioners just didn't want to go that way. They wanted to go and say this is later developed merchandise. And they did it 20 years after the fact. And they did it after the Department of Commerce had issued a series of scope rulings that says, and I think this is critical too, that the terms of the order are unambiguous. In rulings that the Department of Commerce issued, scope decisions, the Department says there's no ambiguity as to the scope of the order. Mr. Marshak, but when they gave us this 50% ruling, they specifically limited it to the beeswax context. They didn't go on to consider what you seem to suggest they meant to consider. I don't believe that's the case, Your Honor. I believe that if you look at the record, first you're going to have the Department of Commerce scope determination saying it unambiguously excludes candles that have less than 50% petroleum wax with vegetable wax. And I think the rulings that we cite in our brief and the scope decisions that are on the record are not limited to beeswax. And then at the time the order was in place in 85, beeswax was an issue. But if you look at the express language of the commission determination, they talk about taking petroleum wax and mixing it with other waxes. But in the Sunset Review, they made it quite clear that they were talking about the beeswax, not petroleum wax. Yes, Your Honor. That's the second Sunset Review. That's the second Sunset Review, yes. Not the original letter, the second Sunset Review. I'll make two points about the second Sunset Review, Your Honor. The first point is if you look at the department determination, the department says we are not relying on the second Sunset Review to make our determination. There's nothing in that determination which is based on the second Sunset Review. And so it's a post hoc rationalization. I think the CIT actually used that in its opinion. And we think the CIT made a mistake because that was not part of the department opinion.  What happened was they originally said in the first Sunset Review, when they started the second Sunset Review, we agree with the like product determination. And then petitioners for strategic regions, when the respondents were not involved in the case, they basically put the evidence into record. There was nobody there to rely on it. And if you look at the second Sunset Determination, it says this determination is based on information we received from petitioners. So the second Sunset Review was not in the Department of Commerce's determination, and we don't believe it should be in your determination. We agree it's there, but it was a record made solely by petitioners. Assuming for the moment that Commerce decided to do a new review and started it all over again, what evidence would be available to them at that point in time? The entire market and commercial availability of the new candles? If Commerce was going to do, you have the record that was made in this review the first time, so the record's there. If they wanted to do it again, we would put additional evidence. If they reopened the record, for example, we'd put additional evidence on the record. Did they accept new evidence in this particular case? The Department of Commerce accepted, yes. They opened up, yes. They opened up the record, they had the record, and they said for respondents and petitioners, put as much information as you have available on regarding existence and commercial availability. Yes, and they had that. Your Honor, I mean, the problem, I'll be very frank, the problem we had, they're asking for information that was 20 years old, and if you look at studies, people just didn't keep evidence or records  as a composition of candles. Candles were not bought and sold based on wax content going back in time. Nobody really, the consumer didn't care, and nobody didn't care. So if you look at the record and say, if you weigh the evidence in the record based on the volume of paper, the number of pieces of paper that petitioners put on compared to the number of pieces of paper that we put on the record, we lose. But that's not how you, Congress should have looked at the record, and that's not how you should look at it. We believe that you should reexamine your decision. It's not the volume of paper, it's the quality of the evidence, and again, we're going to go back now. The key is what the International Trade Commission had before it, saying that this type of candle, you know, existed, that mixed wax candles existed. Mr. Marshak, you're well into your rebuttal time. You want to say it a little? I'll say it a little. Thank you, Your Honor. Thank you. Mr. Dearberg? May it please the Court. This Court should sustain the decision of the Court of National Trade because Congress did not define the term later developed. Congress reasonably interpreted that term, and substantial evidence supports Congress's decision that it was not later developed. First, with respect to the definition of later developed, again, the statute, there's nothing in the statute that defines it. The legislative history has not much guidance in interpreting that term, and Kentucky claims that the term means to bring into existence, but just looking at the dictionary, there are many definitions of the word. In fairness to them, they said at least today, existing in commerce. They weren't getting very close to agreeing with us. That's why I was going to ask you what the difference is between existing in commerce and commercially available. I'm not sure, Your Honor. I mean, that's something that I think they didn't argue that to the trial court. They didn't argue that before commerce. Well, they seem to be arguing a commercial impact test rather than just a commercial availability test. Yes, Your Honor. They claim that commerce applied the indirect standard, a commercial impact standard, but there's no language. I can't cite any language in the determination to support that, and the commercial availability standard is not a new standard for commerce with this case. It's an interpretation of the statute that goes back to the early 1990s, shortly after the statute was enacted. What are the quantitative parameters of commercially available? Is there some number that triggers it? Is there some percentage that triggers it? Your Honor, commerce has not provided a definition in terms of quantity, and I think in other circumstances in which the issue of commercial quantities has come up, they said it basically needs to be a case-by-case determination. I think we can assume for this case that someone selling candles on the roadside and making them in the home, that's not commercial availability. But I would also say that in this case— Well, how are we supposed to test whether or not your construction is reasonable or unreasonable if we don't know what the parameters of it are? Well, Your Honor, I guess I'd also say that I think in this case it's not really an issue because in this case the evidence that was provided, including there were 10 individuals, industry leaders, provided testimony stating that they didn't produce mixed-wax candles, they weren't aware of anyone producing mixed-wax candles, and they explained the difficulties in producing them, technological hurdles to producing them in the late 1990s. In contrast, Nantucket, in another response in this case, couldn't provide any evidence that there was even a single sale at a time of anti-dumping investigation. They couldn't find anyone to testify that they were producing mixed-wax candles in any quantity or that these were available in any quantity. Their evidence was all relating to things like patents going back to the 1930s and then the turn of the century and things of that nature, which a lot of them refer to steric acid. A lot of them is really ambiguous as to what it was referring to. And none of them really dealt with—or none of them dealt with the issue here, which is a mixed-wax candle, which is defined as 50% vegetable wax or more and any amount of petroleum wax. So bringing up issues about steric acid or things like that is not really relevant to this case because that wasn't the inquiry in this case. But the commercial availability, as Judge Proch points out, isn't that really critical to your definition? How do we define that, and how do we know that it is a proper definition? Your Honor, I think, again, the number is not, I think, important in this case because there wasn't any evidence of any production at the time of the anti-dumping investigation. But as far as whether commercial availability as opposed to existence is a proper interpretation, I think that you can look to Congress's prior determinations as consistent with Congress's own prior determinations. I think also— On commercial availability? Yes. So does it have to be a competitive product as such, as defined by the order? Well, I think as part of a later developed merchandise, there are essentially two different categories or two criteria. The first is, is it later developed? And the second question is, is it the same class or kind of merchandise? And that question goes to— There's no competition in the marketplace. If there's no competition in the marketplace, why should there be an AD against it? Right. Well, I think that's one of the fundamental issues is that— or one of the reasons for commercial availability as a test is that in anti-dumping investigations, it's important whether or not it's— what's going on in the marketplace. So from the standpoint of the petitioners requesting an anti-dumping investigation, they're concerned about what's going on in the marketplace. And then from the standpoint of the ITC, when they do their injury determination, it's important to them as well as what's going on in the marketplace. So a candle that's sitting on an inventor's shelf is really not important, not relevant in terms of deciding whether it was later developed because what the petitioner is concerned with, what the ITC is concerned with, what Congress is concerned with is what goes on in the marketplace. Why not do a separate investigation at that point? Because although it's possible to do a separate investigation, Congress specifically provided an anti-dumping or anti-circumvention statute just for this purpose. So to say that it's possible to do something else is to say that you can't write out the statute. The statute was created for a purpose, and it was created for this very purpose, that here we have candles which are basically the same thing as the candles that were commercially available at the time of anti-dumping investigation and became commercially available later on, partially as a result of technological developments and research. And this is one of the things that the statute was created for, just this type of situation. But that assumes there's some ambiguity in later developed, and I'm not sure I see the ambiguity in later developed. Why is it ambiguous? We all know what isn't later developed, a normal term used, and doesn't develop mean sort of created, or at least be in the shape that it would ultimately be marketable. But you make the leap and say it has to have been on the market in a substantial way, right? Well, Your Honor, I think there's a distinction that's not really relevant to this case, which is, is it tested and ready for commercial production? And that would also fall within Congress's definition of later developed. It's not relevant here just because the time frame between when something is tested and ready for commercial production and the time it actually goes on the market is usually a very short time frame. But later, not necessarily, right? Well, I would say, Your Honor, the difference between a 1986 investigation and appearing on the market in 1999, that's a substantial period of time that, you know, I guess to use the examples of prior Congress determinations where they examined this, you know, tested and ready for commercial production, there were situations where, you know, for example, in a battery component, you know, this material was shipped out to battery producers for testing, and there was an announcement, there was a patent. So all that was already out there, but they had not, you know, geared up factories to actually produce it. And Congress found that that was properly considered later developed. So I think that that is, you know, it includes where it's tested and ready for commercial production, but there's no evidence that it was tested and ready for commercial production. At best, what you have is some evidence of, you know, the possibility of doing something earlier, but not in a way that was commercially available. And a lot of the patents and a lot of the declarations provided by NCA in this case and, you know, through Congress's investigation, explains why it was not possible to produce a commercially available candle at that time, the problems with suiting, the problems with cracking to the candle and blooming, all sorts of problems that made it difficult, if not impossible, prior to the anti-dumping investigation to produce a mixed wax candle. I don't believe you still have answered my question. Why don't you just start a new investigation at that point in time? Because, essentially because petitioners don't have to and Congress doesn't have to and the possibility of... Because of the anti-circumvention statute, which was created specifically for the purpose of preventing circumvention of the anti-dumping order, also... But this was not a circumvention. If you're saying that it was not available at that particular time, right? So it became a new product available. It could have different marketing techniques. It could have different consumer demand and otherwise. So why not start a new investigation at that point? Your Honor, because the way to develop merchandise provision takes in matters, you know, including what you might typically consider circumvention, where someone just makes an effort to get around an order. And I think there's, you know, some issue here with that as well, that it's not just the technology, it's also the fact that you have a really high anti-dumping rate that vary between 50% and 100%. And I think you could, you know, infer from that that one of the reasons for the technological developments and the research going into this was essentially to come up with a product that would avoid paying anti-dumping duties. Do we need to give Commerce the Chevron deference on their anti-circumvention determination? Yes, Your Honor, absolutely. Because the statute is ambiguous, then the question is, is Commerce's interpretation reasonable? And I guess going back to that other question about, you know, is the statute ambiguous, just look to the dictionary. You know, there are, you know, some, the word develop can mean created or, you know, to bring into existence, to be invented. But it can also mean other things. And we cited in our brief, you know, dictionary definitions that include things like developed land. Developed land, the land exists, but to develop it means you make it ready for commercial use. To develop natural resources, same thing. The natural resources exist, you're just making them, extracting and making them available in the marketplace. So there are a lot of definitions like that or a lot of uses of the term develop that do not... That's a slightly different context though, isn't it? Strikes me as land is a little different context than imports, where you have constantly changing commercial products and later developed seems to me there to have a different intent. I don't believe that's the case. I believe that, you know, although those, you know, examples are obviously unique to that particular case, it definitely takes in the concept of the marketplace and what goes on in the marketplace. I'd use another example of, you know, economic development. We talk about developed countries. Those countries exist and the development refers to, you know, economic progress for the country. So I think it's fair, I mean, this is what Congress found, this is what the trial court agreed with, that, you know, there are many definitions to the term and it's not an unambiguous term. And it certainly doesn't mean only one thing, which is to create or to bring it into existence. And it is something, you know, Congress's interpretation in this case is consistent with its interpretation that it's had basically since the anti-circumvention statute was put into place. To go back... Better developed product than means to you, like in land, it was in existence but it was just somehow enhanced? No, that, well, developed land would mean that it was, you know, I guess enhanced or brought to a condition where it could be used in the commercial, you know, in the marketplace. That, you know, it might be, for example, making it available for a building, for a house, something like that. Still struggling to see the contextual relevance of your other examples. Yeah, I think those examples just go to whether or not there's a commercial element or a marketplace element to the definition of development. And I think that, you know, there are many uses of the term development that relate to, you know, economic development or commercial development. It's not just to bring into existence. Did you want to leave a little time for Ms. McGee? Yes, Your Honor. May it please the Court? If mixed wax candles had existed in commerce at the time of the original investigation, foreign producers and U.S. importers would have flooded the market immediately after the anti-dumping duty order had been put in place in 1986. Substantial record evidence, the weight of the evidence, shows that these mixed wax candles that are the subject of this proceeding did not emerge in the marketplace until 1999. Substantial evidence, in fact, there's overwhelming evidence that supports commerce's decision that mixed wax candles were not commercially available at the time of the original investigation. Nantucket continues to rely on three or four pieces of discrete evidence, some date from the early 1900s, to support their argument. Is that the test, though, so we are advocating as long as, if they don't flood the market immediately, then we know they must not be available for commerce at the time? No, that's not the test. We're advocating that the test is commercial availability, that they must be being produced, completed the development process, and be ready for sale in commerce. This record here showed that mixed wax candles did not emerge in the marketplace until 1999. The ITC made that clear in the second Sunset Review that these mixed wax candles were not present in the market at the time of the original investigation in 1986. The test is not whether there's two to three discrete pieces of evidence that are contrary to commerce's finding.  The substantial evidence here consists of producer affidavits linking the commercial production of mixed wax candles to certain investigation, certain patents that were filed after the investigation begun, quantity and value data provided by foreign producers that they did not begin production of these mixed wax candles until 1999 at the earliest. There was a press release publicizing the acquisition of the rights to this technology. There was a lawsuit publicizing over the rights to this technology as well. There was also... Do you have a final thought for us, Ms. McGee? Yes. Your Honor asked about a new investigation. The circumvention was intended to address where a product fell outside the literal scope of the order and it should fall inside the scope of the order. So a later developed merchandise was brought because these candles, these mixed wax candles are effectively indistinguishable from 100% petroleum wax candles. They're in the same market. Thank you, Ms. McGee. Thank you. Mr. Marshak, you have about a minute and a half left. Thank you, Your Honor. I believe what Petitioner's counsel stated puts this case in perspective. She said that if these candles would have existed, they would have flooded the market. Well, that's not the test. It's not a substantial commercial impact test. The question is, were the candles available commercially? Were they somehow in the market, even a very small percentage in the market, and Petitioner's knew about their... did they know about their existence? And I'll get back to the ITC report, which is the most express statement of the fact that these candles had to be commercially available at that time. Petroleum wax candles are composed of over 50% petroleum wax and may contain other waxes in varying amounts. The Commission set the standard, Petitioner's knew about the standard, and the Department of Commerce, in multiple scope determinations, stated that this order was unambiguous. Mr. Marshak, it looks like Commerce did rely on the Second Sunset Review. If you look at A107, the second full paragraph, does that affect your analysis? I don't believe that. They said it supports our determination. I don't believe they relied on it. If you look at their analysis, you could say you could take out the Second Sunset Review and our determination would be exactly the same. It's just a very, very small part of their analysis, one sentence in their analysis. I think the court relied on it a lot more than the Commerce Department did, and we would say that that's a post hoc rationalization, Your Honor. Thank you, Mr. Marshak. Thank you.